UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - X

ACTION NISSAN, INC., a New York      :
Corporation,                                          05 Civ. 3864 (WCC)
                                                     :
                     Plaintiff,              **ECF CASE**
                                                     :
          - against -
                                                     :
NISSAN NORTH AMERICA, a California          **OPINION**
Corporation,                               :     <u>**AND ORDER**</u>

                     Defendant.       :

- - - - - - - - - - - - - - - - - - - - - - X

**A P P E A R A N C E S :**

                                        BRESSLER, AMERY & ROSS, PC
                                        **Attorneys for Plaintiff**
                                        17 State Street
                                        New York, New York 10004

ERIC L. CHASE, ESQ.
GENEVIEVE K. LA ROBARDIER, ESQ.
CHRISTOPHER G. MASSEY, ESQ.
JACQUELYN R. TRUSSELL, ESQ.

          Of Counsel

                                        BINGHAM McCUTCHEN LLP
                                        399 Park Avenue
                                        New York, New York 10022-4689

TIMOTHY J. STEVENS, ESQ.
                                               - and -
          Of Counsel

                                        BINGHAM McCUTCHEN LLP
                                        150 Federal Street
                                        Boston, Massachusetts 02110-1726

WILLIAM N. BERKOWITZ, ESQ.
WILLIAM F. BENSON, ESQ.

          Of Counsel                    **Attorneys for Defendant**

**Copies E-Mailed to Counsel of Record**

**CONNER, Senior D.J.:**

Plaintiff Action Nissan, Inc. ("Action Nissan") brings this action against Nissan North America, Inc. ("NNA") asserting violations of the federal Automobile Dealer's Day in Court Act ("ADDCA"), 15 U.S.C. §§ 1221 *et seq.*, and the New York Franchised Motor Vehicle Dealer Act ("FMVDA"), N.Y. VEH. & TRAF. CODE §§ 460 *et seq.*, as well as various common law claims following NNA's notice of termination of Action Nissan's franchise dealership.[1]  Plaintiff seeks damages in addition to a permanent injunction preventing NNA from effectuating the termination.[2]

Presently before the Court are the parties' cross-motions for summary judgment.  Plaintiff requests summary judgment in its favor on each cause of action alleged, while defendant requests summary judgment in its favor on the federal statutory claim, several of the common law claims and damages. For the reasons stated herein, plaintiff's motion for summary judgment is granted in part and denied in part, and defendant's motion for summary judgment also is granted in part and denied in part.  Also before the Court is plaintiff's motion to bar the testimony of defendant's experts Sharif Farhat and Charles Schillingberg.  This motion is denied as to both experts.


## BACKGROUND

Action Nissan operates a franchised motor vehicle dealership at 40 Route 59 in Nyack, New

---

[1] We have jurisdiction over this action pursuant to 28 U.S.C. § 1331 based on plaintiff's ADDCA claim.  In addition, this Court has jurisdiction over the parties based on diversity pursuant to 28 U.S.C. § 1332(c) as the amount in controversy exceeds $75,000, and plaintiff is a New York corporation with its principal place of business in Nyack, New York while defendant is a California corporation with its principal place of business in Gardena, California.  We exercise supplemental jurisdiction over plaintiff's state statutory and common law claims pursuant to 28 U.S.C. § 1367.

[2] NNA voluntarily stayed its termination of Action Nissan pending the outcome of this litigation. (2d Am. Complt. ¶ 13.)

1

York that sells and services Nissan motor vehicles and parts pursuant to a Nissan Dealer Sales and Service Agreement ("SSA") with manufacturer franchisor NNA.[3]  (Pl. Rule 56.1 Stmt. ¶ 1; Def. Rule 56.1 Stmt. ¶¶ 1, 2, 7, 8.)  The SSA was signed on July 26, 1993 by Louis Stern as dealer principal of the Action Nissan dealership, and subsequently was amended twice to reflect changes in ownership structure giving Louis Stern's son, Jonathan, an 85 percent ownership interest, thereby propelling him to the position of principal owner and executive manager.  (Pl. Rule 56.1 Stmt. ¶¶ 2-3; Def. Rule 56.1 Stmt. ¶¶ 3-5.)

According to the SSA, Action Nissan assumed responsibility for "actively and effectively promoting the sale at retail . . . of Nissan Vehicles within Dealer's Primary Market Area."  (Trussell Decl., Ex. A, art. 2(b).)  Section 1.N. of the SSA's Standard Provisions defines primary market area ("PMA") as

> the geographic area which is designated from time to time as the area of Dealer's sales and service responsibility for Nissan Products in a Notice of Primary Market Area issued by Seller to Dealer.  Seller reserves the right, in its reasonable discretion, to issue new, superseding "Notices of Primary Market Area" to Dealer from time to time.  Such geographic area may at any time be applicable to Dealer and to other Authorized Nissan Dealers.

(*Id.*, Ex. A, § 1.N.)  Action Nissan was assigned to a PMA incorporating the area in and around Nyack, New York.[4]  (*Id.*, Ex. XX at PH-2.)

---

[3] According to the Second Amended Complaint ("Complaint"), Action Nissan originally became a franchised dealer in 1987 for NNA's predecessor, Nissan Motor Corporation USA.  (2d Am. Complt. ¶ 14.)  The parties dispute NNA-made representations regarding the original dealership's size and location as well as whether those representations led Louis Stern to undertake a "costly move and renovation" in order to gain NNA franchise approval.  (*Id.* ¶¶ 15-17; Pl. Rule 56.1 Stmt. ¶¶ 5-8; Def. Rule 56.1 Resp. at 3-4.)  These disputed facts predate the 1993 execution of the SSA permitting operation of Action Nissan at its present location.

[4] Generally, NNA determines the geographic contours of a PMA by aggregating census tracts.  (*Id.*, Exs. XX at 3, WW at 12.)

Apparently, the parties' relationship proceeded smoothly until 1998. At that time, an NNA-requested market study recommended that Action Nissan relocate to Route 304 in Nanuet, New York, a location in close proximity to other motor vehicle dealerships. (Pl. Rule 56.1 Stmt. ¶ 9; Def. Rule 56.1 Stmt. ¶ 35.) Action Nissan was informed of this recommendation by a hand delivered letter and again via certified mail.[5] (Grimm Decl., Exs. G, H.) Another market study was conducted in 2002 that resulted in a similar relocation recommendation. (Pl. Rule 56.1 Stmt. ¶ 10; Def. Rule 56.1 Stmt. ¶¶ 37-38.) Action Nissan was also informed of this study via certified mail. (Grimm Decl., Ex. E.)

There is no doubt that the Sterns viewed relocation favorably. (Pl. Rule 56.1 Stmt. ¶ 14.) The parties' relationship deteriorated, however, with each year that Action Nissan failed to relocate. The reasons for this failure are numerous and vigorously disputed. (Pl. Rule 56.1 Stmt. ¶¶ 16-66; Def. Rule 56.1 Resp. at 8-9, 13-19, 22, 26-28.) While the relocation effort continued, Action Nissan and NNA struggled over the condition of Action Nissan's facilities, which sustained damage in 1999 from Hurricane Floyd and from a subsequent fire. (J. Stern Dep. at 81-83, 287-89; Barrett Dep. at 68; Grimm Dep. at 73.) The damage was not fully repaired until late 2003. (Pl. Rule 56.1 Stmt. ¶ 68.)

On November 10, 2003, Action Nissan sent NNA a letter enclosing plans to substantially renovate its existing facilities while it continued to pursue relocation. (Grimm Decl., Ex. N.) According to NNA, a review of these plans indicated a previously unnoticed deficiency in meeting NNA facility guidelines regarding land and building square footage as well as the required number

---

[5] These letters also expressly stated that, pursuant to § 15.B. of the SSA's Standard Provisions, NNA reserved the right to condition its approval of any potential purchaser of Action Nissan on compliance with the market study recommendation. (Grimm Decl., Exs. E, G, H.)

of service bays.  (Grimm Decl. ¶ 42.)  Shortly thereafter, on November 24, 2003, NNA issued a

Notice of Default pursuant to § 12.B.1. of the SSA's Standard Provisions via certified mail.[6]  (Pl.

Rule 56.1 Stmt. ¶ 71; Def. Rule 56.1 Stmt. ¶ 48.)  The notice stated that Action Nissan failed to

substantially fulfill its obligations under the SSA due to: (1) unsatisfactory sales performance; (2)

unsatisfactory customer satisfaction performance; (3) noncompliance with NNA facilities guidelines;

and (4) noncompliance with NNA capitalization requirements.  (Grimm Decl., Ex. O.)  The notice

provided Action Nissan with roughly three months, or until March 1, 2004, to cure these defects in

---

[6] Section 12.B. reads, in pertinent part:

    B.   Termination by Seller for Non-Performance by Dealer.
    1.  If, based upon the evaluations thereof made by Seller, Dealer shall fail
to substantially fulfill its responsibilities with respect to:
    a.   Sales of new Nissan Vehicles and other responsibilities of Dealer set
forth in Section 3 of this Agreement;
    b.   Maintenance of the Dealership Facilities and the Dealership Location
set forth in Section 2 of this Agreement;

    . . . .

    3.   In the event that any of the following occur:

    . . .

    (ii)   any other act or activity of Dealer . . . which substantially impairs the
reputation of financial standing of Dealer . . . subsequent to the execution of this
Agreement:
    Seller will notify Dealer of such failure and will review with Dealer the
nature and extent of such failure and the reasons which, in Seller's or Dealer's
opinion, account for such failure.
    Thereafter, Seller will provide Dealer with a reasonable opportunity to
correct the failure.  If Dealer fails to make substantial progress towards remedying
such failure before the expiration of such period, Seller may terminate this
Agreement by giving Dealer notice of termination, such termination to be effective
at least ninety (90) days after such notice is given.

(Trussell Decl., Ex. A, § 12.B.)

order to avoid SSA termination.  (*Id.*)  March 1 passed without NNA terminating Action Nissan. Two months later, NNA issued an Extension and Amendment of Notice of Default to Action Nissan via certified mail.  (*Id.*, Ex. P.)  This notice added Action Nissan's unsatisfactory score on the Nissan Service Index ("NSI") to the list of defaults and extended Action Nissan's cure period by 90 days. (*Id.*)  That date too passed without event.

However, on October 15, 2004, NNA issued a Notice of Termination ("N.O.T.") to Action Nissan via certified mail stating that termination would be effective 90 days from Action Nissan's receipt of the notice.  (Trussell Decl., Ex. B.)  The stated reasons for termination included: (1) unsatisfactory sales penetration performance; (2) unsatisfactory customer satisfaction performance; (3) failure to fulfill Nissan facility responsibilities; and (4) failure to maintain wholesale financing arrangements in accordance with NNA guidelines.[7]  (*Id.*)

---

[7] In addition to the performance reasons outlined in Section 12.B., *supra* n.6, Section 12.A. of the SSA's Standard Provisions allows termination for, in relevant part, the following reasons:

> 6.    The failure of Dealer to establish or maintain wholesale financing arrangements which are in accordance with Seller's Guides and which are reasonably acceptable to Seller with banks or other financial institutions approved by Seller for use in connection with Dealer's purchase of Nissan Vehicles . . .;
>
> . . . .
>
> 8.    Any material misrepresentation by Dealer . . . as to any fact relied on by Seller in entering into, amending or continuing with this Agreement, including, without limitation, any representation concerning the ownership, management or capitalization of Dealer;
>
> . . . .
>
> Upon the occurrence of any of the foregoing events, Seller may terminate this Agreement by giving Dealer notice thereof, such termination to be effective upon the date specified in such notice, or such later date as may be required by any applicable statute.

5

On November 17, 2004, Action Nissan filed a Notice of Appeal with the NNA Policy Review Board ("PRB") pursuant to § 16 of the SSA's Standard Provisions seeking review of NNA's termination decision.[8]  (Stephens Decl., Ex. K.)  The procedures governing this internal review mechanism dictate who is permitted to attend an appeal hearing and expressly state that "[t]he Chairman may, in his discretion, exclude anyone from the meeting or any portion thereof."  (Trussell Decl., Ex. PPP, § 5.B.)  The PRB Chairman excluded Action Nissan's legal counsel from the hearing in order to discuss the matter in an "informal" and "businesslike" forum.  (Stephens Decl., Ex. M at 2; Def. Rule 56.1 Stmt. ¶¶ 75, 78.)  Jonathan Stern represented Action Nissan.  (Def. Rule 56.1 Stmt. ¶ 82.)  Mark Grimm, NNA's then-Regional Vice President of the Northeast Region, represented NNA.  (*Id.* ¶ 83.)  Neither party was represented by counsel.  (*Id.* ¶ 84.)  Betsy Kohan,

---

(Trussell Decl., Ex. A, § 12.A.)

[8] Section 16 states, in relevant part:

> A.  Establishment of Policy Review Board
> In the interest of maintaining harmonious relations between Seller and Dealer and to provide for the resolution of certain protests, controversies and claims with respect to or arising out of Section 4, Section 12 or Section 13 of this Agreement, Seller has established the Nissan North America, Inc. in U.S.A. Policy Review Board ("Policy Review Board").  The procedures of the Policy Review Board . . . are incorporated herein by reference. . . . Any decision of the Policy Review Board shall represent the independent decision of Seller and shall be binding on Seller but not on Dealer.

> C.  Appeal of Termination to Policy Review Board
> Any protests, controversies or claims by Dealer (whether for damages, stay of action, or otherwise) with respect to any termination of this Agreement . . . after termination of this Agreement has become effective shall be appealed to the Policy Review Board by filing an appeal in accordance with the procedures established therefor within thirty (30) days after Dealer's receipt of notice of termination . . . within one (1) year after termination has become effective.

(Trussell Decl., Ex. A, §§ 16.A., C.).

6

Senior Counsel for NNA, attended the hearing as, according to NNA, secretary to the PRB. (Am. Answer ¶ 105; Kohan Dep. at 25-27, 80-82.) In a decision dated March 16, 2005, the PRB ruled that NNA had sufficient grounds to terminate Action Nissan.[9] (Stephens Decl., Ex. R.)

Action Nissan then filed a complaint before this Court on April 15, 2005, which it subsequently amended twice. On September 7, 2005, NNA amended the N.O.T. to include a fifth ground for termination (the "Amended N.O.T."). (Trussell Decl., Ex. C.) That count charged Action Nissan with false sales reporting, which NNA claimed was warranted following the discovery of recordkeeping discrepancies during a field audit of Action Nissan's records on NNA dealership incentive programs.[10] (Id.; see id., Ex. A, §§ 6.G., 12.A.10.; Grimm Decl., Ex. R.)

By letter dated September 21, 2005, Action Nissan requested a second PRB review in

---

[9] Despite this ruling, NNA permitted Action Nissan to continue operating. As noted above, supra n.2, the parties have agreed that the effective date of termination would be stayed pending this litigation. However, the parties have failed to specify when this agreement was reached. Therefore, the Court questions why NNA allowed no less than four apparently definitive dates to pass without action.

[10] Section 6.G.2. of the SSA's Standard Provisions sets forth in detail Action Nissan's responsibilities for sales and service records, including the obligation to "accurately submit to [Nissan] such information with respect to Dealer's sales." (Trussell Decl., Ex. A, § 6.G.2.) Section 12.A.10. of the SSA's Standard Provisions permits termination for:

> Knowing submission by Dealer to Seller of: [(i)] a false or fraudulent report or statement; (ii) a false or fraudulent claim (or statement in support thereof), for payment, reimbursement or for any discount, allowance, refund, rebate, credit or other incentive under any plan that may be offered by Seller, whether or not Dealer offers or makes restitution; (iii) false financial information; (iv) false sales reporting data; or (v) any false report or statement relating to pre-delivery inspection, testing, warranties, service, repair or maintenance required to be performed by Dealer.

(Id. § 12.A.10.)

connection with this new charge.  (Stephens Decl., Ex. S.)  This request was denied by letter dated

September 27, 2005.[11]

## DISCUSSION

I.   <u>**Standard of Review**</u>

Under FED. R. CIV. P. 56, summary judgment may be granted where there are no genuine

issues of material fact and the movant is entitled to judgment as a matter of law.  *See* FED. R. CIV.

P. 56(c); *Anderson v. Liberty Lobby*, 477 U.S. 242, 247-50 (1986).  A fact is material only if, based

on that fact, a reasonable jury could find in favor of the non-moving party.  *Anderson*, 477 U.S. at

248.  The burden rests on the movant to demonstrate the absence of a genuine issue of material fact.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  In deciding whether summary judgment is

appropriate, the court resolves all ambiguities and draws all permissible factual inferences against

the movant.  *See Anderson*, 477 U.S. at 255.  To defeat summary judgment, the nonmovant must go

beyond the pleadings and "do more than simply show that there is some metaphysical doubt as to

the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

---

[11] The denial was justified by citation to § 16.D. of the SSA's Standard Provisions, which
provides:

> Because the purpose of the Policy Review Board is to assist in resolving issues
> between Seller and Dealer in a non-adversarial setting and to avoid litigation, if
> Dealer institutes or seeks any relief or remedy through legal, administrative or other
> proceedings as to any matter that is or could be the subject[] of an appeal to the
> Policy Review Board, then the Policy Review Board may, in its sole discretion,
> elect to refuse to consider any appeal to the Policy Review Board then pending or
> thereafter filed by Dealer relating to such subject matter.

(Trussell Decl., Ex. A, § 16.D.)

The court's role at this stage of the litigation is not to decide issues of material fact, but to discern whether any exist.  *See Gallo v. Prudential Residential Servs., L.P.*, 22 F.3d 1219, 1224 (2d Cir. 1994).  _____


## II.      The Automobile Dealer's Day in Court Act ("ADDCA")

The ADDCA "provides a dealer a federal cause of action against an automobile manufacturer who has failed to act in good faith regarding a franchise."[12]  *Gen. Motors Corp. v. Villa Marin Chevrolet, Inc.*, No. 98-CV-5206, 2000 WL 271965, at *17 (E.D.N.Y. Mar. 7, 2000); *see Gen. Motors Corp. v. New A.C. Chevrolet, Inc.*, 263 F.3d 296, 325 (3d Cir. 2001) ("The ADDCA is a remedial statute enacted to redress the economic imbalance and unequal bargaining power between large automobile manufacturers and local dealerships, protecting dealers from unfair termination and other retaliatory and coercive practices." (quoting *Northview Motors, Inc. v. Chrysler Motors Corp.*, 227 F.3d 78, 92 (3d Cir. 2000)); *see also* 15 U.S.C. § 1222.  Pursuant to § 1222

> [a]n automobile dealer may bring suit against any automobile manufacturer engaged in commerce, in any district court of the United States in the district in which said manufacturer resides, or is found, or has an agent, without respect to the amount in controversy, and shall recover the damages by him sustained and the cost of suit by reason of the failure of said automobile manufacturer from and after August 8, 1956, to act in good faith in performing or complying with any of the terms or provisions of the franchise, or in terminating, canceling, or not renewing the franchise with said dealer: *Provided*, That in any such suit the manufacturer shall not be barred from asserting in defense of any such action the failure of the dealer to act in good faith.

The statute defines "good faith" as

> the duty of each party to any franchise, and all officers, employees, or agents thereof

---

[12] The parties correctly refrain from disputing the applicability of the ADDCA.  *See* 15 U.S.C. §§ 1221(a), (c).

to act in a fair and equitable manner toward each other so as to guarantee the one party freedom from coercion, intimidation, or threats of coercion or intimidation from the other party: *Provided*, That recommendation, endorsement, exposition, persuasion, urging or argument shall not be deemed to constitute a lack of good faith.

15 U.S.C. § 1221(e).  Courts in the Second Circuit have noted that "good faith" under the ADDCA "'has a narrow, restricted meaning.'" *Bronx Chrysler Plymouth, Inc. v. Chrysler Corp.*, 212 F. Supp. 2d 233, 245 (S.D.N.Y. 2002) (quoting *Empire Volkswagen, Inc. v. World-Wide Volkswagen Corp.*, 814 F.2d 90, 95 (2d Cir. 1987).   As the court in *Lazar's Auto Sales, Inc. v. Chrysler Fininancial Corp.* explained: "First, the plaintiff must demonstrate that an 'automobile manufacturer' coerced, intimidated or threatened him. Second, the plaintiff must prove that any coercion or intimidation was designed to achieve some improper of wrongful objective."  83 F. Supp. 2d 384, 388 (S.D.N.Y. 2000); *see Empire Volkswagen*, 814 F.2d at 95.  "'[M]ore is required than coercion and subsequent termination for failure to submit, for otherwise the manufacturer would be precluded from insisting upon reasonable and valid contractual provisions.'" *Empire Volkswagen*, 814 F.2d at 95 (quoting *Autowest, Inc. v. Peugeot, Inc.*, 434 F.2d 556, 561 (2d Cir. 1970)).  "A wrongful demand may be inferred 'from all the facts and circumstances' even in the absence of evidence that a formal, explicit demand was made." *Bronx Chrysler Plymouth*, 212 F. Supp. 2d at 245 (quoting *Marquis v. Chrysler Corp.*, 577 F.2d 624, 634 (9th Cir. 1978)).  Of course, "[l]ack of good faith does not mean simply unfairness or breach of a franchise agreement." *Subaru Distrib. Corp. v. Subaru of Am.*, *Inc.,* No. 98 Civ. 5566, 2002 WL 413808, at *12 (S.D.N.Y. Mar. 18, 2002).  "If the manufacturer has an objectively valid reason for its actions, the plaintiff cannot prevail without evidence of an ulterior motive." *Id.*  "This is not to say, however, that a manufacturer who chooses to terminate a dealer can immunize itself from ADDCA liability by simply pointing to a franchise agreement provision

10

with which the dealer ostensibly failed to comply and assert that such provision was the basis for its severance of the franchise relationship." *New A.C. Chevrolet*, 263 F.3d at 326-27.

III.    **The New York Franchised Motor Vehicle Dealer Act ("FMVDA")**

    The FMVDA, N.Y. VEH. & TRAF. CODE §§ 460 *et seq.*, is the New York State counterpart to the ADDCA.[13]  Section 460 declares that the legislature found it necessary to regulate the motor vehicle frachisor/franchisee relationship "in order to prevent frauds, impositions and other abuses upon its citizens and to protect and preserve the investments and properties of the citizens of this state." N.Y. VEH. & TRAF. CODE § 460.   Broadly speaking, the FMVDA prohibits automobile manufacturers from, *inter alia*: (1) terminating a franchise except for "due cause"[14]; (2) coercing a dealer to enter into an agreement or act in a manner contrary to its economic interests by threatening

---

[13] The parties correctly concede that NNA is a "franchisor" and Action Nissan is a "franchised motor vehicle dealer" as those terms are defined in the statute. *See* N.Y. VEH. & TRAF. CODE §§ 462(7) - (9).

[14] Section 463(2)(d) provides that it is unlawful for any franchisor

[t]o terminate, cancel or refuse to renew the franchise of any franchised motor vehicle dealer except for due cause, regardless of the terms of the franchise. A franchisor shall notify a franchised motor vehicle dealer, in writing, of its intention to terminate, cancel or refuse to renew the franchise of such dealer at least ninety days before the effective date thereof, stating the specific grounds for such termination, cancellation or refusal to renew. In no event shall the term of any franchise expire without the written consent of the franchised motor vehicle dealer involved prior to the expiration of at least ninety days following such written notice except as hereinafter provided.

N.Y. VEH. & TRAF. CODE § 463(2)(d)(1).

to cancel an unexpired contractual agreement[15]; (3) conditioning a franchise renewal on a dealer

making substantial renovations or constructing a new facility, except in limited circumstances[16]; or

(4) imposing unreasonable restrictions on the transfer or sale of a franchise.[17]

---

[15] Under § 463(2)(b), it shall be unlawful for any franchisor

[t]o directly or indirectly coerce or attempt to coerce any franchised motor vehicle dealer to enter into any agreement with such franchisor or officer, agent or other representative thereof, or to do any other act prejudicial to the monetary interests or property rights of said dealer by threatening to cancel any unexpired contractual agreement existing between such franchisor and said dealer. Provided, however, that good faith notice to any franchised motor vehicle dealer of said dealer's violation of any terms or provisions of such franchise shall not constitute a violation of this article.

N.Y. VEH. & TRAF. CODE § 463(2)(b).

[16] Section 463(2)(c) provides that it shall be unlawful for any franchisor

[t]o condition the renewal or extension of a franchise on a franchised motor vehicle dealer's substantial renovation of the dealer's place of business or on the construction, purchase, acquisition or rental of a new place of business by the franchised motor vehicle dealer unless the franchisor has advised the franchised motor vehicle dealer in writing of its intent to impose such a condition within a reasonable time prior to the effective date of the proposed date of renewal or extension (but in no case less than one hundred eighty days) and provided the franchisor demonstrates the need for such change in the place of business and the reasonableness of such demand in view of the need to service the public and the economic conditions existing in the automobile industry at the time such action would be required of the franchised motor vehicle dealer. As part of any such condition the franchisor shall agree, in writing, to supply the dealer with an adequate supply of automobiles to meet the sales levels necessary to support the increased overhead incurred by the dealer by reason of such renovation, construction, purchase or rental of a new place of business.

N.Y. VEH. & TRAF. CODE § 463(2)(c).

[17] Section 466(1) provides in relevant part:

It shall be unlawful for a franchisor directly or indirectly to impose unreasonable restrictions on the franchised motor vehicle dealer relative to transfer, sale, right to

Action Nissan alleges that NNA violated each of these provisions.  New York courts have adopted the same standards under both ADDCA § 1222 and FMVDA § 463(2)(b) for proving coercion and lack of good faith—actual coercion or intimidation.  *See*, *e.g.*, *Subaru Distribs. Corp.*, 2002 WL 413808, at *12.  Therefore, these claims will be analyzed together.

Establishing "due cause" under FMVDA § 463(2)(d) appears to require a different analysis. The statute does not define due cause.  However, the court in *Bronx Auto Mall, Inc. v. American Honda Motor Co.*, 934 F. Supp. 596, 611 (S.D.N.Y. 1996), *aff'd per curiam*, 113 F.3d 329 (2d Cir. 1997), stated that due cause is "not satisfied unless the franchisor has both good cause and acts in good faith."  The court relied upon the Uniform Commercial Code to "shed[] light on the meaning of 'good faith.'"  *Id.*  That court therefore settled on a definition of "honesty in fact in the conduct or transaction concerned."  *Id.* (citing N.Y. U.C.C. § 1-201(19).)

## IV.   <u>Application to the Notice of Termination</u>

As noted above, NNA proffered five grounds in support of its termination decision:  (1) unsatisfactory sales penetration performance; (2) unsatisfactory customer satisfaction performance; (3) failure to fulfill Nissan facility responsibilities; (4) failure to maintain wholesale financing arrangements in accordance with NNA guidelines; and (5) false sales reporting.  Action Nissan not only requests that this Court determine that, as a matter of law, each of these reasons is false, but also

---

renew or termination of a franchise, . . . compliance with subjective standards and assertion of legal or equitable rights with respect to its franchise or dealership.

N.Y. VEH. & TRAF. CODE § 466(1).  The section deems it an unreasonable restriction for a franchisor "directly or indirectly to prevent or attempt to prevent a franchised motor vehicle dealer from obtaining the fair value of franchise . . . ."  *Id.* § 466(2).

contends that the principal—and unstated—reason for termination was Action Nissan's inability to relocate to a more central location within the PMA, specifically Route 304 in Nanuet, New York. (Pl. Mem. Supp. Mot. Summ. J. at 13.) Plaintiff alleges that NNA repeatedly threatened to terminate the SSA with Action Nissan unless it relocated, and then frustrated its attempts to do so through purposeful obfuscation and delay in approving both relocation sites and repairs to its existing facility. Defendant denies that its actions fall within the narrow definition of coercion used in analyzing ADDCA and FMVDA claims and moves for summary judgment in its favor on that basis.

In order to whether NNA's allegedly threatening or coercive behavior supports an inference of wrongful demand based on ulterior motives, the Court must separately analyze each purported justification for termination.[18]  Given the lengthy list of genuine issues of material fact we identify below, it is clear that plaintiff's motion for summary judgment on all its causes of action—save its alleged failure to properly maintain floor plan financing—must be denied.  So too must defendant's motion for summary judgment on the ADDCA claim, as the Court must resolve a number of issues of fact before ruling on whether NNA's behavior amounted to actual coercion.

### A.    Unsatisfactory Sales Penetration Performance

NNA's first ground allegedly warranting termination is poor sales performance.  According to the N.O.T., Action Nissan repeatedly was "apprised of its poor sales performance by Nissan representatives, who . . . discussed with [Action Nissan] the nature and extent of these deficiencies, and possible reasons therefore [*sic*]." (Trussell Decl., Ex. B at 2.) "Despite Nissan's counseling and assistance," Action Nissan "failed to make substantial progress toward remedying its sales

---

[18] The ADDCA and FMVDA claims are analyzed together unless otherwise noted.

14

deficiencies." (*Id.*)   NNA views this failure as a material breach of Section 3 of the SSA.

Both SSA Article 2(b) and SSA Standard Provision § 3.A. obligate Action Nissan to "actively and effectively promote . . . the sale at retail . . . of Nissan Vehicles to customers located within Dealer's Primary Market Area."[19]  (*Id.*, Ex. A, art. 2(b) & § 3.A.)  Section 3.A. expressly states that "Dealer's Primary Market Area is a geographic area which Seller uses as a tool to evaluate Dealer's performance of its sales obligations hereunder."  (*Id.*, § 3.A.)  The termination provisions of the SSA link the evaluations conducted in accordance with § 3 to assessing satisfactory completion of sales responsibilities.  (*See id.*, § 12.B.1.a.)  The methods of evaluation are expressly stated in § 3.B., which reads in relevant part:

> Dealer's performance of its sales responsibility for Nissan Cars and Nissan Trucks will be evaluated by Seller on the basis of such reasonable criteria as Seller may develop from time to time, including for example:
> 1.   Achievement of reasonable sales objectives which may be established from time to time by Seller for Dealer as standards of performance;
> 2.   Dealer's sales of Nissan Cars and Nissan Trucks in Dealer's Primary Market Area and/or the metropolitan area in which Dealer is located, as applicable, or Dealer's sales as a percentage of:
> (i)     registrations of Nissan Cars and Nissan Trucks;
> (ii)    registrations of Competitive Vehicles;
> (iii)   registrations of Industry Cars;
> (iv)   registrations of vehicles in the Competitive Truck Segment;
> 3.   A comparison of Dealer's sales and/or registrations to sales and/or registrations of other Authorized Nissan Dealers combined in Seller's Sales Region and District in which Dealer is located and, where Section 3.C applies, for all other Authorized Nissan Dealers combined in the metropolitan area in which Dealer is located; and
> 4.   A comparison of sales and/or registrations achieved by Dealer to the sales of registrations of Dealer's competitors.

(*Id.*, § 3.B.)  The N.O.T. provides a chart reflecting Action Nissan's sales penetration as compared

---

[19] As explained above, the PMA is the primary area for a dealer's sales and service responsibilities.  (*See supra* at 2 & n.4.)

to the Northeast region for the years 1999 to 2004.  (*Id.*, Ex. B at 3.)  According to NNA, these results establish that Action Nissan "has failed even to come close to regional average sales penetration on a consistent and sustained basis since CY99, despite Nissan's counseling.  This poor performance translates into an average sales loss of more than 500 units a year . . . ."  (*Id.*)  In addition, NNA relies on Action Nissan's failure to "significantly" improve is sales effectiveness.  (*Id.*)  From 2003 when Action Nissan received the Notice of Default to 2004, Action Nissan's segment adjusted regional sales effectiveness ("RSE") went from 61.17 percent to 65.65 percent, which "represents an improvement of less than 8% in RSE, which does not constitute substantial progress."  (*Id.*)

### 1.    Contractual Interpretation of Measurement Standards

Action Nissan argues that this justification is improper because it is based on an "extra-contractual 'standard.'" (Pl. Mem. Supp. Mot. Summ. J. at 17.)  Specifically, plaintiff asserts that use of "sales effectiveness" calculated on a regional basis—as opposed to measurement strictly within Action Nissan's PMA—violates the express terms of the SSA.[20]  (*Id.* at 18-19.)  Plaintiff further contends that use of "sales penetration" violates the SSA because NNA "never established it as a standard of performance by notice to the Nissan dealers."  (*Id.* at 20.)

"When faced with a dispute over the meaning of a contractual provision, the court must first determine whether the provision is ambiguous, *i.e.*, whether, on its face, the language of the

---

[20] According to Action Nissan, had NNA properly applied the contractual measurement standard, it would realize Action Nissan's performance was roughly average. (Pl. Mem. Supp. Mot. Summ. J. at 19, 21-22; *see* Trussell Decl., Ex. ZZ at 3-4.)

provision is capable of different, yet reasonable interpretations."[21] *Falkowski v. Imation Corp.*, 132 Cal. App. 4th 499, 505-06, 33 Cal. Rptr. 3d 724, 729-30 (1st Dist. 2005); *see also City of Santa Clara v. Watkins*, 984 F.2d 1008, 1012 (9th Cir. 1993). Under both New York and California law,[22] where "'a contract is straightforward and unambiguous, its interpretation presents a question of law for the court to be made without resort to extrinsic evidence.'" *LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 205 (2d Cir. 2005) (quoting *Postlewaite v. McGraw-Hill, Inc.*, 411 F.3d 63, 67 (2d Cir. 2005)); *see also St. Paul Fire & Marine Ins. Co. v. Am. Dynasty Surplus Lines Ins. Co.*, 101 Cal. App. 4th 1038, 1048, 124 Cal. Rptr. 2d 818 (2d Dist. 2002). "Contracts must be read as a whole, and if possible, courts must interpret them to effect the general purpose of the contract." *Postlewaite*, 411 F.3d at 67; *see also Kitty-Anne Music Co. v. Swan*, 112 Cal. App. 4th 30, 37, 4 Cal. Rptr. 3d 796, 801 (2d Dist. 2003) (quoting *Parsons v. Bristol Dev. Co.*, 62 Cal. 2d 861, 865, 402 P.2d 839, 842, 44 Cal. Rptr. 767, 770 (1965)). "The fundamental, neutral precept of contract interpretation is that agreements are construed in accord with the parties' intent . . . . The best evidence of what parties to a written agreement intend is what they say in their writing." *Postlewaite*, 411 F.3d at 69 (internal quotations omitted); *see also Falkowski*, 132 Cal. App. 4th at 506.

It is clear to the Court that the SSA fully describes the "sales penetration" evaluation method.

---

[21] The SSA provides that California law will apply to "all questions concerning the validity, interpretation or performance of any of its terms or provisions, or of any rights or obligations of the parties." (Trussell Decl., Ex. A, § 17.F.)

[22] While the Court is cognizant of the parties' agreed-to choice-of-law provision, we note that between New York and California law there is no meaningful difference in regard to the issues presented.

However, the Court finds itself less certain as to the "regional sales effectiveness" standard given the parties' inability to properly articulate the specifics of this standard.[23]

### a.     Sales Penetration

Section 3.B. of the SSA's Standard Provisions clearly states that NNA will assess dealership sales performance "on the basis of such reasonable criteria as Seller may develop from time to time." (Trussell Decl., Ex. A, § 3.B.)  While this would certainly be an insufficient description standing alone, the SSA goes on to list various evaluation methods, "*including for example* . . . 2.  Dealer's sales . . . in Dealer's Primary Market Area . . . as a percentage of: (i) registrations of Nissan Cars and Nissan Trucks; . . . 3. A comparison of Dealer's sales and/or registrations to sales and/or registrations of other Authorized Nissan Dealers combined in Seller's Sales Region and District in which Dealer is located . . . ."  (*Id.* § 3.B.2.(i), 3. (emphasis added).)

NNA evaluates its dealers, including Action Nissan, in part by calculating "sales penetration."  NNA's expert defines "sales penetration" as "the ratio of a Nissan dealer's sales (regardless of where they were registered) to the competitive vehicle registrations in the dealer's Primary Market Area (PMA), expressed as a percentage."  (*Id.*, Ex. XX at PH-6.)  He defines "region sales penetration" as "the ratio of sales by all Nissan dealers in a region (regardless of where they are registered) to the competitive vehicle registrations in the region, expressed as a percentage."  (*Id.* at PH-7.)

---

[23] Action Nissan also moves to exclude the expert testimony of Sharif Farhat on the grounds that he employed an improper methodology in analyzing Action Nissan's sales performance.  Its argument in support of that motion tracks its argument on summary judgment.  Therefore, these motions are analyzed together.

Action Nissan's contention that use of "sales penetration" violates the SSA because NNA "never established it as a standard of performance by notice to the Nissan dealers" (Pl. Mem. Supp. Mot. Summ. J. at 20) is contrary to the plain language of the SSA.  Section 3.B.2.(i) spells out that NNA will assess a dealer's sales in its PMA to NNA registrations, and Section 3.B.3. clearly states that it compares dealership "sales *and/or* registrations" to "sales *and/or* registrations" within a dealer's "Region or District."  Both of these statements comport with the industry-accepted definition of sales penetration and region sales penetration.[24]

Of course, the crux of Action Nissan's argument is that NNA violated the contract by basing its calculations on sales outside Action Nissan's assigned PMA.  Action Nissan urges this Court to read the SSA's Standard Provisions so that § 3.A. requires NNA to measure performance based solely on PMA-generated sales figures, while § 3.B. merely "contemplates other means of measurement [that] NNA *could choose* to use, *but* until NNA notifies the dealer of such a choice, it is not a valid standard to apply for a termination."  (Pl. Reply Mem. Supp. Mot. Summ. J. at 7 (emphasis in original).)  The language of § 3.B.2.(i) does limit sales to those within the PMA, but

_____

[24] The Court observes that the language in these provisions is nearly identical to that employed in NNA's Infiniti Division sales agreement, which the United States District Court for the Eastern District of Michigan in *Fred Lavery Co. v. Nissan North America, Inc., Infiniti Division* found to constitute a typical methodology for assessing sales penetration.  *See* No. 99-76065, slip op. at 4, 5, 10, 22 (E.D. Mich. May 23, 2002), *aff'd*, 99 F. App'x 585 (6th Cir. 2004).  It is also duplicative of one analyzed by an administrative law judge in a protest case filed with the Florida Department of Highway Safety and Motor Vehicles.  In *Love Nissan v. Nissan North America, Inc.*, the parties did not dispute that this language set forth the sales penetration calculation NNA was permitted to use and did use in evaluating Love Nissan and all other NNA dealers' sales performance.  *See* No. 04-2247, slip op. at 13 (Fla. DAH July 14, 2005), *adopted as final order*, No. HSMV-06-379-FOF-DMV (Fla. DHSMV Apr. 12, 2006).  The ALJ, in describing the specific method of calculating sales penetration, stated:  "Historically, by case law, and by expert testimony in the instant proceeding, it is found that Nissan's method for evaluating its dealers' sales performance is a reasonable, industry-accepted practice for evaluating new car dealers." *Id.* at 14.

no such limitation exists on the registrations to which the PMA-only sales are compared—§ 3.B.3. clearly indicates a calculation based on "sales and/or registrations" absent any geographic restriction on where those sales occur.[25]  The record reflects numerous NNA-generated performance reports provided to Action Nissan that chart its sales penetration performance vis-a-vis regional averages, thereby further negating Action Nissan's notice argument.  (*See, e.g.*, Grimm Decl., Exs. B-D; Trussell Decl., Exs. M, FF.)  Each of these sales performance letters cites § 3.A. and § 3.B., and includes language stating that sales penetration is "a key barometer used by Nissan to gauge dealership performance" under the SSA.  Accordingly, sales penetration and regional sales penetration are standards described in the SSA and remain as potential justifications for termination. As a result, plaintiff's motion for summary judgment on this count is denied, and the Court will permit Farhat's testimony on sales penetration at trial.

### b.    <u>Sales Effectiveness</u>

None of NNA's sales performance letters, however, even mention "sales effectiveness" or "segment adjusted regional sales effectiveness."  Although the latter term—and accompanying comparative figures—appeared in the N.O.T., plaintiff asserts that it is not mentioned in the SSA. The Court confesses its confusion in relation to this "standard," a confusion due in no small part to

---

[25] NNA assigns dealer's sales responsibility based on *primary* market areas, not *exclusive* market areas. *See Infiniti Automobiles of Norwood, Inc. v. Nissan N. Am., Inc.*, No. 2004-00010, slip op. at 3  (Mass. Sup. Ct. Aug. 4, 2005) ("Although a dealer is primarily responsible for sales and marketing in his or her PMA, PMAs are non-exclusive and dealers are not limited to selling or providing service only to customers residing within their PMA"); *cf. Gene Hamon Ford, Inc. v. David McDavid Nissan, Inc.*, 997 S.W.2d 298, 302 (Tex. Civ. App. 1999) ("A PMA is defined as a specific geographic territory assigned to a particular dealer from which the dealer is expected to make *most* of its sales." (emphasis added)).

the parties' and experts' own lack of clarity when using the terms "penetration" and "effectiveness."
(*See, e.g.*, Trussell Decl., Ex. XX at 5, 6, PH-29; Farhat Dep. at 40-42; Manuel Dep. at 36-37; Pl.
Mem. Supp. Mot. Summ. J. at 19.)  Despite providing clear definitions of sales penetration and
region sales penetration, defendant's expert provides no definition of sales effectiveness, leading us
to believe they are interchangeable, especially given his deposition testimony hinting as much.
(Farhat Dep. at 40-42.)  He does, however, provide a definition of "registration effectiveness," a term
he defined as "the ratio of the number of Nissan Registrations in a PMA to the expected registrations
for the PMA expressed as a percentage.  Expected registrations are derived by multiplying Nissan
competitive registrations in each segment by average Nissan penetration in the Region or District
in that segment."  (Trussell Decl., Ex. XX at PH-26.)  This appears to be an entirely separate
evaluation method, as it does not match plaintiff's expert's proffered definition of sales
effectiveness:  "the ratio of the dealer's sales nationwide to the number of new Nissan Retail
Registrations that would be registered in that dealer's PMA if the brand's performance locally were
equal to its performance in the established benchmark."  (*Id.*, Ex. WW at n.7.)  Until the parties and
their experts elucidate their understanding of this standard—which they will undoubtedly do at
trial—we cannot say whether it comports with the SSA.[26]  Therefore, a determination of the
appropriateness of sales effectiveness will have to be determined after hearing from both plaintiff's

---

[26] The Court observes that sales effectiveness measures have appeared in other cases, to
which NNA was a party, including at least one where the experts in the instant action squared off
in those cases as well over similar issues.  *See Infiniti Automobiles of Norwood*, slip op. at 16 &
nn.5, 20; *Rambasek v. Nissan N. Am., Inc.*, No. 93-03-MVDB-286-D (Ohio MVDB Jan. 7, 2005).
Unfortunately, the discussion of sales effectiveness in those cases has proven unenlightening.  We
also note that no mention of sales effectiveness appeared in *Love Nissan*, No. 04-2247 (slip op.),
despite its highly similar nature to the case at bar.

and defendant's experts at trial.  Plaintiff's motion for summary judgment on this ground is therefore denied, as is its motion to bar Farhat's expert testimony.

### 2.      Application of Measurement Standards

Action Nissan contends that NNA's demands that the dealership relocate led it to construe sales assessment data against the dealership.  Establishment of the dealership's history of poor performance would make NNA's termination appear justified.  Action Nissan asserts that this justification was mere pretext.  *See New A.C. Chevrolet*, 263 F.3d at 327 ("Even if a manufacturer contends that its termination decision was motivated by a desire to enforce a reasonable contractual provision and that it possessed 'objectively valid reasons for terminating its relations with a dealer,' a franchisee can state a claim for relief under the ADDCA by alleging that the manufacturer possessed an 'ulterior motive for its action.'" (quoting *Northview*, 227 F.3d at 94)).  Action Nissan argues that: (1) it maintained average sales when the calculation was restricted to sales within its PMA, and that NNA miscalculated by failing to consider mitigating factors as required by the SSA; and (2) it was not properly informed of its sales responsibilities.  NNA counters each argument, and asserts that none of Action Nissan's claims constitute threats or coercion as those terms are understood under the ADDCA.

### a.      Whether Action Nissan's PMA Was Properly Drawn

This is a statistically dense case, in which issues of fact have been generated by the battle of

the experts.  One such issue centers around Action Nissan's claim that its PMA is too large.[27]
According to defendant's expert,  "From a marketing perspective, a PMA represents the area in
which the resident Nissan dealer should enjoy a competitive advantage over all other Nissan dealers
due solely to geographic factors such as dealer location." (Trussell Decl., Ex. XX at 3.)  The parties
have failed to indicate whether Action Nissan was aware of its PMA prior to signing the SSA.  Given
that so much of this dispute centers around Action Nissan's location, and given that plaintiff
maintained a dealership with NNA's predecessor at a different location, the omission seems glaring.
Plaintiff's expert, Ernest H. Manuel, Jr., Ph.D., includes a lengthy analysis of air distance and drive
distance in an attempt to establish what should be the proper contours of Action Nissan's PMA.
(Trussell Decl., Ex. WW at 13, 15-16.)  Defendant's expert, Sharif Farhat, offers his critique.  (*Id.*,
Ex. XX at 8.)  Both experts apparently modified Action Nissan's assigned PMA in an effort to prove
their respective points, and each claimed in their respective rebuttal reports that the other's
modifications were erroneous.  (*Id.*, Exs. ZZ at 6-7; AAA at 3.)

Plaintiff asserts that its sales figures are depressed because at least one other dealership,
Ramsey Nissan, is closer to a large portion of Action Nissan's PMA.  (*See* J. Stern Dep. at 133-35.)
According to Manuel, the sales figures for Ramsey Nissan, one of the strongest performing dealers
in the New York district and northeast region, reveal that it is selling a substantial number of
vehicles outside its own PMA.  (*Id.*, Ex. WW at 16-21.)  Farhat denies that Ramsey Nissan is
stealing sales from Action Nissan because of its proximity to certain census tracts comprising Action

---

[27] The Court is under the impression that Action Nissan's Nyack PMA was redrawn
sometime in 2005.  However, the parties have not supplied any information on how that change came
about or how it has impacted Action Nissan's sales performance.

Nissan's PMA.[28]  (*Id.*, Ex. AAA at 4.)  Despite the wealth of sales and registration data kept by NNA, neither party has provided the Court with a clear showing regarding the number of sales expected within each census tract, nor the number of registrations within Action Nissan's PMA accounted for by Ramsey Nissan.

Regardless, plaintiff argues that calculating sales effectiveness based on sales outside the assigned PMA depresses its performance.  Manuel states that, "to the extent . . . any shortfall in Action's sales performance exists, it is strictly a function of the dealership's performance in other dealer's PMAs."  (*Id.*, Ex. ZZ at 9.)  This would seem a logical conclusion given Farhat's own acknowledgment that a competitive advantage exists only within the confines of one's respective PMA.  Therefore, there is a question of not only whether sales effectiveness is a contractually permitted evaluation technique, but also whether it was properly calculated, which we have just indicated above is an open question requiring trial.

        **b.**        **Whether NNA Properly Considered Mitigating Factors**

Action Nissan further argues that NNA failed to mitigate the performance results properly as required by § 3.D. of the SSA's Standard Provisions, entitled "Additional Factors for Consideration," which provides:

> Where appropriate in evaluating Dealer's sales performance, Seller will take into account such reasonable criteria as Seller may determine from time to time, including, for example, the following[:] the Dealership Location; the general shopping habits of the public in such market area; the availability of Nissan Vehicles to Dealer and to other Authorized Nissan Dealers; any special local

---

[28]  In *Love Nissan*, the ALJ noted that while the plaintiff there asserted "that consumers on the periphery of [its] PMA are physically closer to dealers in other PMAs, . . . this is clearly a factor common to almost every PMA in the nation."  *Love Nissan*, slip op. at 34.

marketing conditions that would affect Dealer's sales performance differently from the sales performance of other Authorized Nissan Dealers; the recent and long term trends in Dealer's sales performance; the manner in which Dealer has conducted its sales operations (including advertising, sales promotion, and treatment of customers); and the other factors, if any, directly affecting Dealer's sales opportunities and performance.

(*Id.*, Ex. A, § 3.D.)  Farhat proceeds through a number of factors in an effort to show that Action Nissan's poor performance was due to factors within its control.  (*Id.*, Ex. XX at 9-11.) Manuel naturally counters both that Farhat is mistaken and that other factors not under Action Nissan's control in fact depressed its sales performance.  (*Id.*, Ex. ZZ at 16-19.)

In addition to the Court's need to resolve this dispute by making specific findings of fact after a bench trial,[29] the Court must assess how NNA applied other factors, including dealership location, recent and long term sales performance trends and dealer's operations.  Questions of fact remain concerning how NNA factored in the unique features of Action Nissan's PMA, such as its proximity to the Hudson River and Harriman State Park.  (*See* Manuel Dep. at 128-29; 148.)  NNA also noted that Action Nissan's sales performance did improve, but not, according to NNA, in a "substantial" amount.  (Trussell Decl., Ex. B at 3.)  Without some standard assigned, it is impossible for the Court to determine at this stage what constitutes "substantial" change.  Also, it is apparent from the deposition testimony that NNA questioned the experience level of Jonathan Stern as well as his ability to manage multiple dealerships effectively.  (*See, e.g.*, Grimm Dep. at 38, 78, 149-50, 156.) NNA's sales performance reports and contact reports indicate that NNA provided advice to Action Nissan on how to improve performance (Grimm Decl., Exs. B-D; Trussell Decl., Ex. M), yet it remains unclear as to what specifically was suggested. (J. Stern. Dep. at 355; Hamilton Dep. at 102-

---

[29] *See Marquis*, 577 F.2d at 634 & n.18 (noting effect on jury of defendant's intention to take into account local conditions).

03.)  These are important factual circumstances that require the Court's consideration at trial in order to decide whether inferences warrant a finding of lack of good faith.  *See Ford Motor Co. v. West Seneca Ford, Inc.*, No. 91-CV-0784, 1996 WL 685723, at *5 n.16 (W.D.N.Y. Nov. 21, 1996); *see also Rambasek*, slip op. at 42.

### c.    Whether NNA Adequately Informed Action Nissan of its Sales Responsibilities

Action Nissan does not dispute that NNA was contractually permitted to send it default and termination notices under § 12 of the SSA's Standard Provisions.  Instead, Action Nissan alleges that at no time did NNA provide it with a clear indication of what constituted satisfactory performance.  In support of this argument, Action Nissan attempts to illustrate the unreasonableness of NNA's sales penetration standard.  According to plaintiff, from the very nature of an average "[i]t is an impossibility for all dealers to simultaneously achieve Regional average sales penetration." (Pl. Mem. Supp. Mot. Summ. J. at 21.)  Therefore, if average is the benchmark, approximately half of all NNA dealerships would be in breach of their sales responsibilities at any given time and therefore subject to immediate termination.  (*Id.*)  While the Court has seen a number of internal NNA contact reports on meetings with the Sterns, we have seen only three written sales performance reports sent to Action Nissan in the five-year period at issue in this action.  While these letters and contact reports charge that Action Nissan's performance was deficient, they fail to establish an acceptable level of performance.

The ambiguity plaintiff points out does not warrant summary judgment in favor of plaintiff, but rather presents a genuine issue of material fact, *i.e.*, the reasonableness and good faith of the

26

manner in which NNA applies these statistics in deciding upon termination where roughly half of all dealers are constantly in technical breach of the SSA. *See Marquis*, 577 F.2d at 635 (noting jury's consideration of "motivation, timing and manner of termination"); *see also Love Nissan*, slip op. at 52 (analyzing reasonableness of terminating below-average dealership by comparing treatment of other deficient dealers).

### B.    Unsatisfactory Customer Satisfaction Performance

The second reason listed in the N.O.T. is unsatisfactory customer satisfaction performance due to Action Nissan's consistently below average score on the Nissan Purchase Index ("NPI"), which measures a dealer's treatment of its customers through customer-completed questionnaires and surveys. Under § 5 of the SSA's Standard Provisions, Action Nissan is obligated to maintain certain standards of service in order to promote goodwill for itself and NNA products. Section 5.F. of the SSA's Standard Provisions provides in relevant part:

> Dealer's performance of its service and parts responsibilities will be evaluated by Seller on the basis of such reasonable criteria as Seller may develop from time to time, including for example:
> 1. Dealer's performance in building and maintaining consumer confidence in Dealer and in Nissan Products as measured by surveys or indices on consumer satisfaction as compared with performance levels achieved by other Authorized Nissan Dealers in Seller's Region or District in which Dealer is located or such other means as may be deemed appropriate by Seller . . . .

(Trussell Decl., Ex. A, § 5.F.) The reasonableness of the NPI method was the subject of extensive expert analysis, deposition testimony and briefing. In addition to seeking summary judgment on its unreasonableness, plaintiff also moves to exclude the expert testimony of Schillingberg on grounds that parallel plaintiff's summary judgment argument. Plaintiff also contends that Schillingberg is

not qualified to testify.  However, NNA withdrew this as a ground for termination during the parties'

cross-motions for summary judgment.  (Def. Mem. Opp. Mot. Summ. J. at 18-19.)  Plaintiff argues

that NNA's late withdrawal should result in a finding that, as a matter of law, its reliance on this

ground constitutes a violation of the SSA.  (Pl. Reply Mem. Supp. Mot. Summ. J. at 10-11.)  The

Court declines plaintiff's invitation.  Rather, NNA's decision simply forces it to rely on the

remaining four grounds for termination.  The Court, therefore, will hear no testimony relating to

customer satisfaction, and plaintiff's motion to bar Schillingberg's testimony is denied as moot.  In

addition, plaintiff's motion for summary judgment with regard to N.Y. VEH. & TRAF. CODE §

463(2)(v), which requires that any customer satisfaction index or other customer satisfaction

measurement tool be "designed and implemented in such a way that it is fair and equitable" to both

the manufacturer and the dealer," also is denied as moot.


### C.    Failure to Fulfill Nissan Facility Requirements

The third ground for termination lies in Action Nissan's purported breach of § 2.A. of the

SSA's Standard Provisions, which states:

> A.   Location and Facilities.
> Dealer shall provide, at the Dealership Location approved by Seller in
> accordance with Section 2B hereof, Dealership Facilities that will enable Dealer to
> effectively perform its responsibilities under this Agreement and which are
> reasonably equivalent to those maintained by Dealer's principal competitors in the
> geographic area in which Dealer's Primary Market Area is located.  In addition, the
> Dealership Facilities shall be satisfactorily in space, appearance, layout, equipment
> signage and otherwise be substantially in accordance with the Guides therefor
> established by Seller from time to time.

(Trussell Decl., Ex. A, § 2.A.)

The condition and location of Action Nissan's dealership lies at the heart of this entire action.

In the N.O.T., NNA charges that it repeatedly "discussed the abysmal, dilapidated and even dangerous condition" of Action Nissan's dealership facility over a period of years.  (*Id.*, Ex. B at 5.) Specifically, NNA "recommended that rather than rebuild[] the facility in its current location, [Action Nissan] relocate to the automotive retail area in Nanuet, New York." (*Id.*)  NNA contends that, despite signing a Relocation Commitment Letter ("RCL") agreeing to pursue this recommendation, Action Nissan breached the terms of the RCL.  (*Id.*)  According to the N.O.T., NNA allowed plaintiff "ample opportunity to make all necessary renovations and improvements" to its existing dealership.  (*Id.* at 6.)  Nevertheless, NNA charges that plaintiff's "interminable delay . . . has been disruptive to Nissan customers and cannot enhance the Nissan brand and image in the marketplace." (*Id.*)  Action Nissan counters that the Court should determine, as a matter of law, that it has always maintained compliance with facilities guides and made good faith efforts—frustrated by NNA's refusal to permit renovations and delay in approving potential relocation sites—to repair damage and relocate.  (Pl. Mem. Supp. Mot. Summ. J. at 33-34; Pl. Reply Mem. Supp. Mot. Summ. J. at 12.)

The Court finds that genuine issues of material fact abound.  First, NNA charges that it discovered a disparity regarding land and building square footage following receipt of renovation plans in early November 2003.  (Grimm Decl. ¶ 42 and Ex. N.)  Action Nissan points out that an October 2002 NNA memorandum indicates that the dealership was above guide.  (Trussell Decl., Ex. JJJ; Pl. Mem. Supp. Mot. Summ. J. at 35.)  The figures contained in this memorandum, however, have been rendered obsolete given the different square footage figures indicated in Action Nissan's 2003 plans and those on record with NNA.  This Court granted NNA permission during a court conference on April 21, 2006 to survey the site in order to correct these figures.  Because the Court

29

has not been informed of the results of the resurvey, it cannot now determine whether NNA had a proper basis for resting on this ground.

Second, as regards Action Nissan's efforts to relocate, a number of facts remain at issue. While Action Nissan executed several RCLs, which provide specific dates for completing property acquisition and submitting construction plans/contracts (Trussell Decl., Ex. W; Grimm Decl., Ex. K), the parties have generated significant questions about these letters. It remains unclear why multiple RCLs were signed. More critically, the Court is unable to discern whether an RCL creates a binding contract indicating NNA's approval of the proposed site or constitutes merely a formality necessary for obtaining NNA site approval. (*Compare* Grimm Dep. at 115, 118-20, 124-26, *with* J. Stern Dep. at 350-57.) Indeed, NNA's approval process remains the subject of serious dispute, particularly as to whether NNA purposely delayed approving potentially viable sites, whether Action Nissan rejected adequate sites due to spending limits and whether NNA was in fact willing to provide Action Nissan with financial assistance under its standard construction incentive program. (*See*, *e.g.*, L. Stern Dep. at 197; J. Stern Dep. at 39-40, 105-06, 348-49, 369, 389-90; Grimm Dep. at 128, 140, 191.)

Third, the parties disagree not only over the extent of damage to the current facility caused by a 1999 hurricane, but also how that damage affected the dealership's ability to transact business effectively. (J. Stern Dep. at 290-91; Barrett Dep. at 72; Grimm Dep. at 74-75.) Directly impacting this issue are disputed facts over Action Nissan's ability to repair the damage and NNA's willingness to approve such repairs. (J. Stern Dep. at 86-99, 100-03, 288-90, 293-95; Hamilton Dep. at 111-12, 127-28; Grimm Dep. at 74-75, 81-82.)

Accordingly, summary judgment relating to facility condition and relocation is not appropriate.


### D.        Failure to Maintain Wholesale Financing Arrangements

The fourth ground for termination listed in the N.O.T. states that Action Nissan maintained only 75 percent of the required New Vehicle Floor Plan financing in violation of SSA Standard Provision § 12.A.6.  (Trussell Decl., Ex. B at 6.)  Action Nissan maintained floor plan financing, or the line of credit used to obtain new vehicle inventory, with Primus Automotive Financial Services ("Primus").  (Mascia Dep. at 20, 22.)  If and when Action Nissan required a floor plan increase, it would telephone Primus to request it; all paperwork was completed by Primus.  (*Id.* at 44.)  According to NNA, it informed Action Nissan of new financing requirements via letter dated December 20, 2002.  (Grimm Decl., Ex. F.)  Action Nissan had not raised its floor plan financing to meet this new level as of the October 15, 2004 N.O.T.  (*Id.* ¶ 31.)  Joseph Mascia, Primus's region manager, stated that Primus "dropped the ball" in relation to increasing Action Nissan's floor plan financing in accordance with NNA factory minimums as requested by Action Nissan.  (Mascia Dep. at 47, 50, 56, 59; *see also* J. Stern Dep. at 189-91, 195.)  On October 20, 2004, Mascia sent a letter to Jonathan Stern apologizing for the error and initiating the line increase request immediately.  (Trussell Decl., Ex. LLL.)  Despite this error, Mascia testified that at no point was Action Nissan on finance hold or unable to purchase NNA vehicles for its inventory.  (Mascia Dep. at 50; *see also* J. Stern Dep. at 193-94.)

NNA requests that this Court not permit Action Nissan to "hide behind the skirts of its lender" (Def. Mem. Opp. Mot. Summ. J. at 24) in escaping what this Court finds at most amounts

31

to a hypertechnical violation of the SSA.  NNA offers no evidence refuting Primus's admitted responsibility for the unintentional error other than noting the two-year period it took to rectify the error, an error which in no way limited Action Nissan's ability to stock NNA vehicles.  Accordingly, the Court awards plaintiff summary judgment that, as a matter of law, NNA lacked cause to terminate plaintiff's dealership on this ground.

### E.    Fraudulent Sales Reporting

The fifth and final ground for termination—knowing submission of false or fraudulent sales reporting data—was added almost a year after NNA issued the N.O.T.  (Trussell Decl., Ex. C.)  The Amended N.O.T. states that an audit of Action Nissan's sales records "revealed numerous instances in which [Action Nissan] falsely reported the identity of the purchaser, the date of the purchase, and/or other information." (*Id.* at 1.)  This was done in an apparent effort to qualify for NNA bonus programs.  (Grimm Decl., Ex. S at 1.)  According to the auditor's report, there were "several instances" of incorrectly listing sales under incentive programs, and 11 instances of submitting incorrect customer address information.  (*Id.*)  The Amended N.O.T. states that this represents a violation both of the SSA's introductory paragraph barring deceptive practices and of § 12.A.10., which prohibits fraudulent sales reporting.  (*Id.*)

Certainly, as plaintiff points out, audits are conducted in order to catch mistakes.  Action Nissan was audited one year before as well, at which time a lesser number of similar errors was discovered.  (Trussell Decl., Ex. MM at 1.)  At that time, NNA's auditor submitted written recommendations that plaintiff agreed to implement.  (*Id.* at 2.)  However, the most recent audit uncovered still more discrepancies.  Plaintiff appears to place some of the blame on its then-general

32

sales manager, whom NNA recommended and whom Action Nissan fired based on this increased error rate.  (Pl. Mem. Supp. Mot. Summ. J. at 37.)  Defendant argues that these intentional acts of plaintiff's salesmen are attributable to plaintiff.

The Court notes that neither party has explained the process NNA uses to determine which dealers to audit.  Nor is there any evidence as to the standards NNA uses to determine the level of sales reporting irregularities a dealer must commit before it decides that termination is warranted.  Certainly the rise in sales reporting errors following the hiring of an NNA-recommended sales manager coupled with the fact that this reason was tacked on well after the N.O.T. was issued and the litigation was well under way creates a question as to the validity of this ground for termination.  Indeed, treating Action Nissan differently than other dealer's committing similar violations would implicate violations of, at the very least, FMVDA § 463(2)(d)(1).  *See Lazar's Motor Car Corp. v. BMW of N. Am., Inc.*, 152 F.3d 919 (2d Cir. 1998) (discussing bad faith of pretextual audit under the FMVDA).   These evidentiary issues preclude summary judgment on this ground.

## V.      Plaintiff's Additional Grounds for Summary Judgment

### A.      Failure to Provide a Full and Fair Policy Review Board Hearing

Action Nissan seeks affirmative relief dismissing the N.O.T. and Amended N.O.T. because NNA breached the SSA by not providing a full and fair hearing before its PRB.   While insinuating—without producing any evidence—that the NNA-employed PRB members were biased, plaintiff focuses on the PRB Chairman's decision to exclude plaintiff's counsel from the hearing as the main basis for its claim.  The procedures governing PRB hearings expressly provide that "[t]he Chairman may, in his discretion, exclude anyone from the meeting or any portion thereof."  (Trussell

33

Decl., Ex. PPP, § 5.B.)  NNA asserts that the PRB Chairman excluded Action Nissan's legal counsel from the hearing in order to discuss the matter in an "informal" and "businesslike" forum.  (Stephens Decl., Ex. M at 2; Def. Rule 56.1 Stmt. ¶¶ 75, 78.)  Plaintiff contends that NNA violated its duty to hold a hearing in good faith because it permitted Betsy Kohan, Senior Counsel for NNA, to attend the hearing.  According to NNA, Kohan attended merely as secretary to the PRB.  (Am. Answer ¶ 105; Kohan Dep. at 25-27, 80-82.)

The facts establish that neither plaintiff's representative, Jonathan Stern, nor NNA's representative, Mark Grimm, was represented by counsel during the hearing.  (Kohan Dep. at 20; Grimm Dep. at 132; Pl. Rule 56.1 Stmt. ¶ 258.)  Nor did Grimm consult with counsel at any point during the hearing.  (Grimm Dep. at 132.)  Indeed, Jonathan Stern stated Kohan "didn't say anything" during the hearing.  (J. Stern Dep. at 265-66.)  In addition, Kohan stated that she had never met Grimm prior to the start of the hearing.  (Kohan Dep. at 45-46.)  Although Jonathan Stern felt that he was "short-changed" by the process and that the result was "predetermined" (J. Stern Dep. at 257, 267), plaintiffs have put forth no evidence suggesting that the PRB members exercised their duties in an improper manner. We do not believe that any rational finder of fact could determine otherwise.  We therefore deny plaintiff's motion for summary judgment seeking a determination that NNA breached the terms of the SSA due to the PRB's actions.

### B.    Estoppel

Plaintiff asserts that the FMVDA estops NNA from basing its termination decision on any of its five stated grounds because "NNA did not cite the principal reason for termination," *i.e.*, Action Nissan's failure to relocate.  (Pl. Mem. Supp. Mot. Summ. J. at 13.)  Plaintiff supports its

claim by citing N.Y. Veh. & Traf. Code § 463(2)(d)(1), which requires that a franchisor "notify a franchised motor vehicle dealer, in writing of its intention to terminate . . . stating the specific grounds for such termination." NNA put forth five reasons for termination; plaintiff claims that these reasons are pretextual. The Court must evaluate them on the basis of evidence adduced at the trial. It cannot ignore them merely because there is another unstated reason for termination. Accordingly, plaintiff's motion for summary judgment based on estoppel is denied.

## VI.   <u>Breach of Implied Covenant of Good Faith and Fair Dealing</u>

Defendant contends that plaintiff's allegation of breach of the implied covenant of good faith and fair dealing should be dismissed because (1) plaintiff has failed to establish damages and (2) it is duplicative of plaintiff's breach of contract claim. We discuss plaintiff's alleged lack of damages below. It is sufficient to dismiss this cause of action as duplicative of the breach of contract cause of action.

Under both New York and California law there exists an implied covenant of good faith and fair dealing in every contract binding each party not to frustrate the right of the other parties to receive the benefit of the agreement. *See 511 W. 232nd Owners Corp. v. Jennifer Realty Co.*, 98 N.Y.2d 144, 153, 773 N.E.2d 496, 500, 746 N.Y.S.2d 131, 135 (2002); *Guz v. Bechtel Nat'l Inc.*, 24 Cal. 4th 317, 349, 8 P.3d 1089, 1110 (2000). However, "'[i]f the allegations do not go beyond the statement of a mere contract breach and, relying on the same alleged acts, simply seek the same damages or other relief already claimed in a companion contract cause of action, they may be disregarded as superfluous as no additional claim is actually stated.'" *Hall v. EarthLink Network, Inc.*, 396 F.3d 500, 508 (2d Cir. 2005) (quoting *Careau & Co. v. Sec. Pac. Bus. Credit, Inc.*, 222 Cal.

App. 3d 1371, 1395, 272 Cal. Rptr. 387, 400 (1990); *see also True v. Allstate Ins. Co.*, 160 F. App'x

616, 618, No. 04-15793, 2005 WL 3502840, at *2 (9th Cir. Dec. 23, 2005) (quoting same).

An analysis of the Complaint reveals that the breach of implied covenant cause of action rests

entirely on the same predicate actions as the breach of contract claim.  Although plaintiff argues

there is a "fundamental *legal* distinction between the two causes of action [such] that there may be

a breach of good faith and fair dealing without any technical breach of that underlying contract" (Pl.

Mem. Opp. Mot. Summ. J. at 17), plaintiff's attempt to establish this distinction only further

establishes the duplicative nature of the claim.  Consequently, defendant's motion for summary

judgment is granted, and the cause of action is dismissed.


**VII.   Tortious Interference**

Defendant also moves to dismiss plaintiff's cause of action for tortious interference.  "The

elements of tortious interference with contract are well-settled under New York law. . . . : the

existence of a valid contract between the plaintiff and some third party; knowledge of that contract

by the defendant; defendant's intentional inducement of a breach by the third party to the contract;

and damages to the plaintiff as a result of the third party's breach." *Lazar's Auto Sales,* 83 F. Supp.

2d at 391 (citing *Int'l Minerals & Res., SA v. Pappas*, 96 F.3d 586, 595 (2d Cir. 1996)).  Although

plaintiff alleges in its Complaint that defendant tortiously interfered with plaintiff's "relations with

customers, suppliers and others," even construing all inferences against defendant, there is no

indication that NNA directed any action toward anyone other than Action Nissan. *See id.*  This claim

is therefore dismissed.

**VIII.   <u>Failure to State Damages</u>**

Defendant moves for summary judgment on plaintiff's damages claims given plaintiff's failure to provide any assessment of damages incurred following NNA's issuance of the N.O.T.  As a result of this failure, defendant also seeks to dismiss the ADDCA and common law breach of contract claims, which defendant argues require proof of damages.

Section 1222 of the ADDCA expressly indicates that a dealer "shall recover the damages by him sustained and the cost of the suit."  15 U.S.C. § 1222.  The FMVDA contains a similar damages provision.  Section 469 of the N.Y. Vehicle and Traffic Code permits a dealer to sue for injunctive relief and/or damages, including costs and reasonable attorney's fees.  Under these statutes it is clear that plaintiffs already have sustained "damages" by pursuing litigation.  It cannot be said that the remedial purpose of these statutes would be destroyed if defendant's position were adopted.

Of course, defendant's argument ignores the fact that plaintiff seeks a permanent injunction, an element of which is "'the absence of an adequate remedy at law and irreparable harm if the relief is not granted.'"  *Maier-Schule GMC, Inc. v. Gen. Motors Corp.*, 850 F. Supp. 1095, 1101 (W.D.N.Y. 1994) (quoting *N.Y.S. Nat'l Org. for Women v. Terry*, 886 F.2d 1339, 1367 (2d Cir. 1989)).  Irreparable injury is manifest if plaintiff, which by contract can sell only NNA vehicles and parts, is forced to close its dealership.  *See Scuncio Motors, Inc. v. Subaru of New England, Inc.*, 555 F. Supp. 1121, 1125 (D.R.I. 1982).

While plaintiff's failure to detail its damages on discovery does not defeat plaintiff's right to assert these causes of action, it may limit the damage award, if any.  Plaintiff indicated in its interrogatory response that any damage calculation would be provided through its damages expert.  Apparently no such expert report has been provided.  Plaintiff is therefore instructed to inform

defendant within one week of the date of this Opinion and Order whether plaintiff will in fact rely on such expert testimony.  If so, plaintiff will have thirty (30) days from the date of this Opinion and Order to produce its expert's report, whereupon defendant will have thirty (30) days to submit its rebuttal expert report.  Any deposition of these experts must be completed no later than November 30, 2006.

As for defendant's argument that plaintiff's failure to identify damages defeats its breach of contract claim, that argument is likewise rejected.  It is without doubt that damages are an essential element of a breach of contract action.  *See Flash Elecs., Inc. v. Universal Music & Video Distrib. Corp.*, 312 F. Supp. 2d 379, 406 (E.D.N.Y. 2004); *Twentieth Century Fox Film Corp. v. Marvel Enters., Inc.*, 220 F. Supp. 2d 289, 293 (S.D.N.Y. 2002) (applying California law).  Defendant argues that no harm or damages exist because it has agreed to postpone the effective termination date until after this Court has ruled on whether its termination is legally permissible.  However, this is not only subject to any expert analysis on lost sales resulting from Action Nissan's inability to renovate or relocate, but also ignores the fact that Jonathan Stern identified damages associated with his appearance before the PRB as well as realty and architecture company fees.  These damages, which total more than $10,000 are sufficiently established to withstand defendant's motion.  Accordingly, defendant's motion for summary judgment is denied with respect to both the damage and breach of contract claims.

## CONCLUSION

For all of the foregoing reasons, the motion of Action Nissan, Inc. ("Action Nissan") for summary judgment on all causes of action is granted in part and denied in part.  The motion of

Nissan North America, Inc. ("NNA") for summary judgment also is granted in part and denied in part.  We grant Action Nissan's motion for summary judgment with respect to the wholesale financing termination ground, but deny its motion on the remaining four NNA-asserted grounds for termination.  We also deny Action Nissan's motion for summary judgment requesting a finding of bad faith by the Policy Review Board as well as its motion to estop defendant from basing its termination decision on any of the grounds stated in the Notice of Termination.

We grant NNA's motion for summary judgment on, and accordingly dismiss, the breach of implied covenant of good faith and fair dealing claim and the tortious interference claim.  We deny defendant's motion for summary judgment on damages and the Automobile Dealer's Day in Court Act.

Finally, plaintiff's motion to bar the expert testimony of Sharif Farhat is denied, and its motion to bar the expert testimony of Charles Schillingberg is denied as moot.


SO ORDERED.

Dated:  White Plains, New York
        September 22, 2006



_____
Sr. United States District Judge




39